IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| ANDREW WILLEY, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) Case No. 18-CV-81 <br> ) |
| THE HONORABLE JACK EWING, in his capacity as Judge of Galveston County Court at Law Number Three, | ) <br> ) <br> ) <br> ) |
| Defendant. | ) <br> ) <br> ) |

# COMPLAINT

The American criminal system is adversarial. In an adversarial system, cases are resolved not by the inquiries of a judge, but instead by the confrontational testing of facts by the state and defense counsel. For this to work, defense counsel must be independent of the judge: he must be free to express his views and to advocate for his clients without fear of personal retaliation from the court. "Indeed," the United States Supreme Court has said, "an indispensable element of the effective performance of [the defense function] is the ability to act independently of the Government and to oppose it in adversary litigation." *Ferri v. Ackerman*, 444 U.S. 193, 204 (1979).

Andrew "Drew" Willey is a criminal defense attorney who vigorously advocated for his clients in court. He also publicly expressed the view that his clients deserve to be treated fairly even though they are too poor to afford an attorney. He sought to provide them with a defense that met the minimal standards of the State Bar of Texas and of the United States Constitution. In retaliation, Defendant Judge Jack Ewing attempted to silence him by improperly removing him from cases to which he was assigned and by passing him over for future appointments. Willey files

this suit to vindicate his right to advocate for his clients and to speak out on their behalf without fear that he will be removed from his position as a result.

## Parties

1. Plaintiff Drew Willey is a graduate of Gideon's Promise, a non-profit organization, formerly known as the Southern Public Defender Training Center, that aims to provide a "voice for the voiceless" by giving "new public defenders the skills and knowledge necessary to become excellent advocates for those they represent." Through Gideon's Promise, Willey attended training at the Harris County Public Defender's office.

2. Willey is passionately committed to indigent defense. He believes that commitment to be commanded by his Christian faith. And in the service of that commitment, he has created a non-profit organization called Restoring Justice, whose "mission is to pursue Christ's justice" through "loving and fighting for the people the system has forgotten."

3. While he is working to get the non-profit off the ground, Willey maintains a successful criminal-defense practice. He takes both appointed and retained cases in Houston, Galveston, and their environs.

4. Willey's private practice is financially successful. He takes appointed cases in Galveston because he believes that it is his duty as an attorney and as a person to use his experience and skills to help those in need and to use his practice to change the criminal system for the better.

5. Defendant Judge Jack Ewing is the judge of Galveston County Court at Law Number Three. He was first elected in 2014. He is sued in his official capacity.

## Indigent Defense in Texas and Galveston County

6. The indigent defense system in Texas is in crisis. Lawyers throughout the state are forced to handle so many cases that they could not possibly provide their clients the defense

required by the Constitution. In 2015, the Texas Indigent Defense Commission studied the problem of inadequate defense throughout the state. It found that a constitutionally adequate defense system required a 66% increase in attorney time for indigent defendants, a 500% increase in attorney time spent filing motions, and a 1,300% increase in investigator time.

7. Under Texas law, judges control the appointment of counsel for indigent people charged with crimes. Although some judges authorize a public defender's office to represent defendants in their courts,[1] the overwhelming majority of indigent defendants in Texas are appointed private counsel selected by the judges before whom the defendants' cases are pending. This creates an entrenched conflict of interest: instead of fighting for the undivided interests of their clients, lawyers must ensure they do not upset or inconvenience the judges. Throughout Texas, lawyers fear retaliation if they advocate too vigorously for their clients.

8. Before 2001, each Texas judge was solely responsible for the appointment of counsel in her courtroom. According to expert reports prepared at the time, this resulted in a "hodgepodge" of systems that varied between counties and between individual judges within counties. Many people were convicted and sentenced to jail without counsel at all. When lawyers were appointed, they were often untrained in criminal law and ill-equipped to handle their cases. The State exercised no oversight over indigent defense. TEXAS APPLESEED, THE FAIR DEFENSE REPORT 44–45 (2000).

9. In 2000, a survey revealed that judges in Texas were abusing their appointment powers. "Nearly half of . . . judges [surveyed] (46.4 percent) report[ed] that their peers sometimes appoint counsel because they have a reputation for moving cases, *regardless of the quality of the*

---

[1] In Texas, each court has only one judge. Galveston County has four Justice of the Peace Courts (numbered 1–4); three County Courts at Law (numbered 1–3); six Judicial District Courts (the 10th, 56th, 112nd, 212th, 306th, and 405th); and one probate court.

*defense* they provide . . . [and] [n]early four in ten judges (39.5 percent) indicate[d] that their peers occasionally appoint an attorney because he or she is a friend, while roughly one-third of judges sometimes consider whether the attorney is a political supporter (35.1 percent) or has contributed to their campaign (30.3 percent)." ALLAN K. BUTCHER & STEPHEN K. MOORE, THE TEXAS STATE BAR ASSOCIATION, MUTING GIDEON'S TRUMPET: THE CRISIS IN INDIGENT CRIMINAL DEFENSE IN TEXAS 12 (2000) (emphasis in original).

10. In 2001, in response to widespread problems with the assigned-counsel system, Texas passed the Texas Fair Defense Act (TFDA), which requires that counties adopt formalized "indigent defense plans" and that those plans meet a few minimal requirements.

11. Although the TFDA allows counties to establish public defender offices, each judge is empowered to determine whether that office may represent clients in that judge's court. The vast majority of judges do not use a public defender, either because no public defender is established in their county or because they choose not to allow the public defender to appear in their court.

12. The TFDA requires that counties employ a "system of rotation" to assign counsel for criminal defendants. In each case, "[t]he court shall appoint attorneys from among the next five names on the appointment list in the order in which the attorneys' names appear on the list, unless the court makes a finding of good cause on the record for appointing an attorney out of order. An attorney who is not appointed in the order in which the attorney's name appears on the list shall remain next in order on the list." Tex. Code Crim. P. art. 26.04 (a). The act specifically requires that county plans "ensure that appointments are allocated among qualified attorneys in a manner that is fair, neutral, and nondiscriminatory." *Id.* at (b)(6).[2]

---

[2] Some counties may use an "alternative plan." Tex. Code Crim. P. art 26.04(g). These plans are chiefly used in small counties that join other small counties to coordinate services. In counties using an alternative plan, "appointments [must be] reasonably and impartially allocated among qualified attorneys." *Id.*

13. Galveston County's indigent defense plan mirrors the TFDA. Galveston's plan creates a graduated list of attorneys under which more experienced attorneys may be appointed to represent clients charged with more serious crimes. The plan also creates the office of an Indigent Defense Services Coordinator tasked with maintaining the list of attorneys, ensuring that the attorneys on the list are qualified, ensuring that the Criminal Courts "follow the plan for appointing attorneys," and processing complaints about appointed attorneys.

14. By March 1 of each year, the Criminal Courts Board—which is composed of all district and county-court-at-law judges with jurisdiction over Galveston County—must conduct a performance review of every attorney on the list. By majority vote, the judges determine if each attorney should stay at the same level on the graduated list, go up a level, go down a level, or be removed from the list.

15. The plan lists eight specific grounds for removal from the list, but, regardless of the other grounds, the plan allows an attorney to be removed from the list "for good cause at the discretion of a majority vote of the Criminal Courts Board."

16. If someone makes a complaint about an attorney, the Plan provides that the Coordinator shall forward the complaint to the Board. The Board "shall schedule a hearing to address the complaint." The Coordinator "shall notify the attorney, in writing, of the Board meeting and shall provide the attorney copies of the written and signed complaint. The attorney may respond to the complaint by providing a written, signed response to the Board, by appearing in person at the Board meeting to address the Board, or both."

17. In the County Courts at Law, attorneys are appointed to individual cases of non-jailed defendants from within the first five names on the level of the graduated list to which the case belongs. No attorney may be passed over from within those five "more than twice" unless the

court finds, in writing, that she is conflicted out of the case or that there is other "good cause" for failing to appoint her.

18. The County Court at Law judge who is assigned to the jail docket appoints two attorneys to represent defendants charged on that docket "for a period not to exceed one week." The two attorneys generally agree that each will represent half of the defendants charged that week. According to the Galveston County Plan, "the County Court at Law Judge shall appoint the attorneys for the week from within the first five names on the . . . Graduated List with the understanding that the attorney appointed for the week must come from within the first five names on the appointment list."

19. The Galveston County Plan requires that "[e]xcept where otherwise provided for in Section XII C of the Plan [which covers people arrested on warrants from other counties], the attorney representing the defendant at jail docket is appointed to represent the defendant in the pending criminal matter until final resolution of the case."

20. If a judge wishes to replace appointed counsel, the judge may do so only after "entering written findings in the record showing good cause for the replacement and no prejudice to the defendant, including, without limitation: (a) Current information about the defendant and charges indicates that counsel of different qualifications is appropriate for the defendant under these rules; or (b) Replacement of appointed counsel in a death penalty case is required under . . . the Code of Criminal Procedure." Otherwise, the attorney must remain on the case absent a request by the defendant or the attorney.

21. If an attorney believes that a client's case requires the assistance of an investigator or mental-health professional, the attorney must move the court for approval of funds for those

services. If the request is approved, the service providers submit their bills directly to the Indigent Defense Services Coordinator.

22. After a case or appointment is completed, the attorney submits a voucher to the court that presided over the case. If that court's judge does not approve the full voucher amount, she must "make written findings stating . . . the reason for approving an amount different from the requested amount." The attorney may then "file an appeal with the Presiding Judge of the 2nd Administrative Region," which contains Galveston County. The trial judge then has an opportunity to increase the voucher amount. If the trial judge declines to increase the amount, or if the increased amount remains insufficient to satisfy the attorney's fee, the Presiding Judge rules on the appeal and determines the final approved amount.

## The Galveston Jail Docket

23. People arrested in Galveston County who cannot immediately pay a secured money bail amount—and who are therefore jailed—appear before a County Court at Law Judge on a "jail docket."

24. Defendants on the jail docket are brought in shackles to a courtroom in the Galveston County Jail. In the courtroom, the defendants remain behind a Plexiglas wall that divides the courtroom roughly in half.

25. On either side of the courtroom sit two attorney-consultation areas where lawyers may speak to their clients, also through Plexiglas and aided by a telephone.

26. A Galveston County Court at Law judge presides over the docket from chambers via a videolink system. The judges preside over the jail docket in weeklong rotations. On the jail docket, judges appear on the videolink only when it is time to formally appoint counsel and accept bargained-for pleas.

27. Before the daily court sessions begin, the defense attorneys plea bargain with the prosecutor in the courtroom. The defense attorneys relay offers from the assistant district attorney on duty in the courtroom to their clients via the Plexiglas-partitioned telephone system. This is the first occasion that an attorney and client have met, and no legal or factual investigation has been done on the case. If a detained person decides to accept a plea offer, that person may enter her plea when court begins. If she does not accept a plea offer, she will be jailed until her trial unless she can pay a money-bail amount.

### Judge Ewing Removed Willey from Cases to Which he had Been Assigned and Refuses to Assign Him to Further Cases Because of His Constitutionally Required Advocacy on Behalf of his Clients in their Cases and his Political Advocacy Concerning Systemic Constitutional Violations

28. On June 22, 2015, Judge Ewing appointed Willey to represent W.L., who had been charged with Burglary of a Vehicle, a Class A Misdemeanor under Texas law.

29. When Willey initially began work on the case, he quickly discovered blatant inconsistencies in the arresting police officer's statements regarding the case.

30. Willey accordingly asked the assistant district attorney working on the case to dismiss the burglary charge or, alternatively, to reduce it to an attempted burglary charge. The assistant district attorney refused.

31. Unable to persuade the assistant district attorney that the charges were unsupportable, Willey needed to prepare the case for trial. To do that, he needed to interview witnesses, some of whom were potentially adverse to his client.

32. The State Bar of Texas's Non-Capital Defense Performance Guidelines read: "If Counsel conducts interviews of potential witnesses adverse to the client, counsel should attempt to do so in the presence of an investigator or other third person in a manner that permits counsel to effectively impeach the witness with statements made during the interview."

33. Consistent with the State Bar of Texas's guidelines, Willey hired an investigator, Geoff Anderson.

34. After several months of investigating, negotiating with the assistant district attorney, and appearing in court, Willey secured a plea offer from the State with terms that were very favorable to W.L.

35. W.L. accepted the offer. On February 23, 2016, W.L. disposed of his case by pleading guilty to a Class C Misdemeanor.

36. On February 29, 2016, Willey submitted a payment voucher to the Galveston County Criminal Courts at Law for $1,320.

37. By email, Judge Ewing altered the voucher, approving only $511.15.

38. Judge Ewing wrote that the payable amount had been reduced because of "excessive out of court hours."

39. Willey appealed that determination to the presiding judge of the administrative region containing Galveston County.

40. In response to the appeal, Judge Ewing added roughly $300 to the voucher request.

41. Willey continued to request the full amount, and the presiding judge, after reviewing Willey's appeal, approved the full voucher amount.

42. Willey later discussed the voucher issues with Judge Ewing and explained that he believed that a constitutionally adequate defense required the expenditures that he made. He explained that his concern was less with a few hundred dollars and more with the principle that the County should provide constitutionally adequate funds for indigent defense.

43. Previously, on November 4, 2015, Judge Ewing appointed Willey to represent C.L., who had been charged with a Class B misdemeanor.

44.     Willey helped C.L. negotiate a disposition that required her to participate in a diversion program in order for her case to be dismissed. Because C.L. is indigent, Willey needed to work closely with her to ensure that she was placed in a program without unaffordable fees—most such programs in Texas currently require defendants to pay money not to be prosecuted—and to convince the district attorney on the case that such a program was appropriate.

45.     On April 28, 2016, C.L.'s case was dismissed. Willey submitted a voucher on May 2, 2016.

46.     Willey's voucher for C.L.'s was for $528. On May 3, 2016, Judge Ewing reduced that amount, by email, to $330, citing excessive time for a case that was ultimately dismissed. Willey appealed Judge Ewing's decision, and the Presiding Judge denied the appeal.

47.     On May 3, 2016, Willey sent Judge Ewing a letter explaining his concerns about the lack of resources for appointed attorneys in Galveston. In the letter, Willey discussed a denied request for investigator funds in the case of M.M., one of the clients whom Willey represented. Willey also discussed the vouchers he submitted on behalf of W.L. and C.L.

*Willey Diligently Advocates for his Jail-Docket Clients in May 2016*

48.     Willey was appointed to work the jail docket for the week of May 2, 2016, alongside another local attorney named Mark W. Stevens. Judge Ewing was on the bench in the jail docket that week.

49.     As is typical on the jail docket, Willey and Stevens agreed that each would represent half of the defendants charged that week.

50.     Of the clients Willey represented on the jail docket, only four clients did not plead guilty that week: C.N., J.F., K.N., and J.P. Willey began working on their cases.

51. In the jail docket, Willey filed motions for release on personal recognizance on behalf of all four clients.

52. In support of the motions, Willey submitted an extensive memorandum of law.

53. Willey argued in the memorandum accompanying the motions that it is unconstitutional to jail someone solely because she cannot afford to pay a secured money bail amount.

54. No attorney appears to have argued before in the Galveston Criminal Courts that it is unconstitutional to jail someone solely because she cannot afford to pay a secured money bail amount, even though courts across the country—including the United States Court of Appeals for the Fifth Circuit—have recently held that it is.[3]

55. Judge Ewing summarily denied the motions.

56. Willey also filed motions for waiver of court costs for those who could not afford to pay them and for credit for time served for impoverished people who were jailed because they could not pay court costs. (Impoverished people are routinely jailed in Galveston County because they cannot pay court costs.) In support of these motions, Willey submitted an extensive memorandum of law in which he argued that it is unconstitutional to jail someone solely because she is poor.

57. No attorney appears to have made this argument before in the Galveston Criminal Courts, even though the Supreme Court has for decades held that it is illegal to jail someone solely because she cannot pay a sum of money.[4]

---

[3] *ODonnell v. Harris Cnty., Tex.*, ___ F.3d ___, 2018 WL 851776, at *10 (5th Cir. Feb. 14, 2018) (striking down the use of secured money bail without inquiry into ability to pay because it invidiously discriminates against the poor).

[4] *Bearden v. Georgia,* 461 U.S. 660, 672–73 (1983); *Tate v. Short*, 401 U.S. 395, 398 (1971); *Williams v. Illinois*, 399 U.S. 235, 241 (1970).

58.     Judge Ewing summarily denied the motions.

59.     Willey's jail docket assignment ended on May 6, 2016.

60.     At that time, Willey believed that Judge Ewing would follow the Galveston Indigent Defense plan and formally appoint Willey to represent the clients with whom he consulted and whose cases remained pending.

61.     Willey discussed the appointments with Mark Stevens, the other lawyer assigned to the jail docket, and Mr. Stevens also believed that Willey would be appointed to represent the clients with whom he consulted and whose cases remained pending.

### *Willey Files a Complaint with the Texas Indigent Defense Commission Alleging Systemic Constitutional Violations in the Jail Docket*

62.     On May 20, 2016, Willey filed a complaint with the Texas Indigent Defense Commission.

63.     In the complaint, Willey explained several problems with the jail docket in Galveston. He argued that the money-bail system in Galveston is unconstitutional, that the videolink system used by the court violates Texas law, that inmates are systematically serving jail time because they are unable to pay court costs, that the docket is impermissibly controlled by the district attorney's office, and that attorneys cannot communicate with their clients confidentially.

### *Judge Ewing Removes Willey from Cases to Which He Had Been Appointed*

64.     On May 31, 2016, Willey discovered that he was no longer appointed to represent J.P.

65.     By May 31, 2016, J.P.'s case had been assigned to Judge John Grady, Judge of Galveston County Criminal Court at Law Number 1.

66. Willey spoke with Judge Grady's clerk, Ms. Connie Nolan, who told him via email that she would correct what she thought must have been an error, and that she would reassign Willey to the case.

67. Willey also emailed Case Management Specialist Roger Morrison, who apologized for the inconvenience and said that he would see what could be done.

68. Later that day, Nolan told Willey that Aimee Rowe, Judge Ewing's clerk, had visited Nolan that morning and told Nolan that Judge Ewing had told Rowe not to assign Willey to the case because he was upset with Willey over "something that happened in jail docket."

69. When Nolan told Judge Grady about Judge Ewing's instructions, Judge Grady instructed Nolan not to reassign the case to Willey.

70. Willey emailed Nolan asking her to confirm what happened. She wrote back that he should "take that up with Judge Ewing."

71. Willey then checked his files and compared them with Galveston county's online system. He discovered that he had been removed from the cases of C.N., J.F., K.N., and J.P. All four cases had been assigned to Mark Stevens.

72. By that point, only J.P.'s case remained pending. So, the same day, Willey emailed Stevens to discuss J.P.'s case. Willey told Stevens that he had met with J.P. outside of the jail and had gone to view evidence at the police station. Willey told Stevens that he believed J.P.'s case presented serious due process concerns.

73. Later in the day on May 31, 2016, Willey emailed Judge Ewing and Ms. Rowe to ask for clarification. Willey told Judge Ewing and Ms. Rowe that, despite being appointed to represent the clients on the jail docket, meeting the clients, advising the clients, and doing work

for the clients, he was no longer appointed to represent them. Willey asked Judge Ewing to confirm that he had, in fact, asked Ms. Rowe to remove him from the cases.

74. By June 9, 2016, Judge Ewing still had not responded to Willey's email. So Willey emailed to follow up with him about the appointments issue and two outstanding concerns: an unpaid voucher and an unfilled request for investigator funds.

75. In response, Judge Ewing wrote only that he had denied the request for investigator funds. Judge Ewing did not provide a reason for denying the request for investigator funds.

*The Galveston County Office of Justice Administration Falsely Accuses Willey of Incompetence*

76. On July 8, 2016, Bonita Quiroga, the Director of the Galveston County Office of Justice Administration ("OJA"), which supervises the Indigent Defense Coordinator and other offices, filed a response to Willey's complaint with the Texas Indigent Defense Commission. OJA disputed Willey's constitutional arguments and practical concerns.

77. But OJA went further. In response to Willey's concerns about counsel appointments, OJA wrote that "a Court may assign a case to an attorney other than the jail docket attorney if the Judge of the Court believes the assigned attorney is not competent to represent the defendant. Although this happen [*sic*] very infrequently, it did happen with a case Mr. Willey was assigned to handle."

78. Willey was very concerned that OJA had inaccurately reported the reason he had been removed from J.P.'s case. No one had alleged (much less found) Willey to be incompetent in any respect. OJA's letter offered no basis for its allegation, and OJA has not offered one since.

### *Judge Ewing Explains His Retaliation and Promises to Remedy It*

79. On or around July 15, 2016, Judge Ewing met with Willey to discuss the response to his complaint and his removal from the cases to which he had been assigned in the jail docket. Willey recorded their conversation.

80. During the conversation, Judge Ewing began by saying that "it's my prerogative who to appoint to represent people and I don't have to justify why I appoint certain people and why I don't." He claimed that attorneys assigned to the jail docket are not necessarily appointed to represent their clients throughout their cases. Therefore, Judge Ewing said, Willey had not been "removed" from his clients' cases; he had not been appointed to their cases in the first place.

81. But Judge Ewing immediately contradicted this view. In explaining why he appointed Mark Stevens to Willey's clients' cases, Judge Ewing said that "Mark Stevens *happened to be on the jail docket* and there were a number [of cases] that went without getting resolved that week." If jail docket appointments did not ordinarily lead to appointments for the remainder of the case, Mark Stevens ought to have been as likely to be appointed as anyone else.

82. Judge Ewing revealed that he did not remove Willey from his clients' cases because he believed Willey was incompetent. "I never said I didn't think you were competent, but I decided that Mark Stevens should receive some of those cases." Judge Ewing said he "felt as though there were two attorneys and they [the cases] should be divided up equally."

83. The cases were not divided equally. Of the cases that were not resolved during the jail docket, Stevens was appointed to all of them and Willey appointed to none. When Willey pointed out this obvious fact, Judge Ewing responded by saying only "I don't have to answer to you why I appoint people and why I don't."

84. Judge Ewing and Willey then went back and forth over whether jail docket attorneys are supposed to represent clients throughout their cases. Judge Ewing maintained that there is no restriction on when a judge can replace counsel during the pendency of a case because indigent defendants do not have a right to choose their attorneys.

85. Then Judge Ewing abruptly shifted gears. He had been justifying appointing Stevens to represent Willey's clients by claiming that he wanted appointments to be equally distributed. But then, unprompted, he said "I do feel as though you are the only attorney that on almost every case you had in my court, did you ask for an appointment of an investigator." Judge Ewing revealed that "[i]n the year and a half that I've been judge—trust me—there are no others."

86. Judge Ewing explained that he was concerned that Willey worked too many hours on cases in which the client pleaded guilty. For a case that is resolved in a guilty plea to warrant more than three hours of work, Judge Ewing said, there needed to be an "emergency."

87. Willey has worked more than three hours on several cases that resulted in guilty pleas.

88. Willey explained, with respect to one particular case, that "the reason it took more work was because the prosecutors were unreasonable with their offer and then they became reasonable after four or five hundred dollars' worth of work . . . . And after all that work then they saw that it was reasonable. So sometimes pleas don't just mean pleas; sometimes you've gotta work and show the prosecutors the realities."

89. Willey then asked Judge Ewing to clarify that he had never said, and did not believe, that Willey is incompetent. Judge Ewing said "I did not. I haven't told anybody anything [and] I don't have to explain to anybody the reason I don't appoint somebody."

90. Instead, Judge Ewing turned to his third inconsistent explanation for removing Willey from his cases. This time, Judge Ewing explained that Willey "lacked . . . the experience that Mark Stevens has, which is true by, 20 some odd years. So you lack the experience he has."

91. Willey asked whether Judge Ewing believed that he did not have enough experience to represent the clients from whose cases he had been removed.

92. Judge Ewing did not contend that Willey lacked the experience to competently represent the clients from whose cases he had been removed.

93. Instead, Judge Ewing explained that Willey lacked the experience to "to know what is reasonably needed sometimes to handle the case." Judge Ewing said he "think[s] [Willey] overwork[s] cases."

94. Court appointments, Judge Ewing said, "[are] not a glamorous thing to do. I did my tour of duty on court appointments. And it is very hard, when you start, to understand the volume of people that come through and the cases that we have to handle. There is a delicate balance between making sure that that person gets adequately represented, as opposed to did they get the best representation."

95. Judge Ewing had previously said that Willey was the *only* lawyer in his court to request funds for an investigator in any misdemeanor cases. As the Texas State Bar's guidelines confirm, it is impossible to provide an adequate defense in many cases without an investigator.

96. Willey said that he was "gonna be honest on my timesheets on the time that I spend and if you've got to cut 'em for budgetary reasons, whatever, you know, that's, we'll deal with that, and that's not my big issue right now. My big issue was being pulled off a case because of whatever thoughts about that." Willey meant that Judge Ewing and he could deal with disputes

over the appropriate payment for his work through the process established by the Galveston Indigent Defense Plan and the Texas Fair Defense Act.

97. Judge Ewing responded that it's "within my prerogative as a judge, moving our docket, who to assign cases and who not to."

98. Willey continued to explain that his primary concern was with continuity of representation for his clients. Judge Ewing asked whether Willey wanted to be re-appointed to J.P.'s case, and when Willey said he did, Judge Ewing said "I'll do that."

*Willey Files a Complaint with the State Commission on Judicial Conduct*

99. By June 15, 2017, Judge Ewing still had not appointed (or asked Judge Grady to appoint) Willey to J.P.'s case, as he had promised to do.

100. On June 15, 2017, Willey filed a complaint with the State Commission on Judicial Conduct alleging that Judge Ewing violated the principles requiring continuity of representation.

101. On October 17, 2017, the Commission wrote back to Willey. The Commission explained that "the judge's conduct in this instance, while not necessarily appropriate, did not rise to the level of sanctionable misconduct." The Commission "remains confident that the conduct will not occur in the future."

*Judge Ewing Further Retaliates by Refusing to Appoint Willey to New Cases*

102. Since the May 2, 2016, jail docket, Willey has been appointed to only one case before Judge Ewing.

103. In that case, Willey was appointed pursuant to recently revised procedures during the jail docket over which another judge was presiding. These new procedures require that attorneys be appointed immediately for anyone who has been arrested, but that appointment is

effected only through handing the lawyer a piece of paper with the client's name on it; the lawyer does not receive a formal appointment until a later stage of the proceedings.

104. Therefore, Judge Ewing did not choose to appoint Willey to the one case to which Willey has been appointed in Judge Ewing's court.

105. Willey has not been appointed to any non-jail-docket cases in Judge Ewing's court since May 2016.

106. Before May 2016, Willey regularly received appointments to non-jail-docket cases in Judge Ewing's court. And given the number of attorneys on the panel in Galveston, it is very unlikely (even without knowledge that Judge Ewing had previously intentionally removed Willey from cases because of his advocacy) that random selection would have caused Willey to receive zero appointments in non-jail-docket cases before Judge Ewing over this period.

107. Judge Ewing has not issued any findings that Willey is conflicted or otherwise ineligible to be appointed to cases in his court.

108. Throughout his time representing indigent clients in Galveston County, Willey has worked diligently on behalf of his clients and has billed only reasonably necessary hours.

## Claim for Relief

### *Count One*: Retaliation in Violation of Willey's First Amendment Rights

109. Willey incorporates by reference paragraphs 1–108 of this Complaint.

110. Judge Ewing removed Willey from the cases to which he had already been appointed and refuses to assign him to additional cases because Willey publicly complained about the practices in the Galveston County criminal system, because he sought to provide a vigorous legal and factual defense for his clients, and because he made reasonable requests for the funds necessary to provide a vigorous legal and factual defense for his clients.

111. Judge Ewing retaliated against Willey because of his constitutionally protected advocacy, which includes, but is not limited to, non-frivolous (indeed meritorious) motions, requests for reasonable funds, complaints to state authorities, in- and out-of-court memoranda, and in-person conversations with Judge Ewing.

### **Prayer for Relief**

Plaintiff Andrew Willey respectfully requests:

- A declaratory judgment that Judge Ewing may not retaliate against him for filing non-frivolous motions, requesting reasonable funds, and for advocating in and out of court;
- An injunction requiring Judge Ewing to reinstate Willey to his previous position on the graduated list and to resume appointing him to cases[5];
- An award of reasonable attorney's fees under 42 U.S.C. § 1988[6];
- And any other relief this Court considers appropriate.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
*Attorney in Charge*
(S.D. Tex. Bar No. 2998395)
Eric Halperin
(*pro hac vice* application forthcoming)
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
charlie@civilrightscorps.org
(202) 670-4809

---

[5] Willey recognizes that the Fifth Circuit has held that maintaining and administering a panel for counsel appointments is a judicial act, and he recognizes that an injunction therefore may not issue against Judge Ewing under 42 U.S.C. § 1983 unless declaratory relief was unavailable or unless Judge Ewing violates a declaratory decree. *Davis v. Tarrant Cnty., Tex.*, 565 F.3d 214, 227 (5th Cir. 2009). Willey includes this claim for relief only to preserve his argument that the Fifth Circuit's holding on this point is incorrect. *See, e.g.*, *Mitchell v. Fishbein*, 377 F.3d 157, 174 (2d Cir. 2004).

[6] Willey also recognizes that attorney's fees are unavailable under *Davis*. Willey includes this request to preserve his argument that the Fifth Circuit's holding in *Davis* is incorrect.